UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

W.W. Williams Company,

    Plaintiff,

    v.                             Case No. 2:13–cv–713

Google, Inc., *et al.*,                Judge Michael H. Watson

    Defendants.

## OPINION AND ORDER

This is an action for direct trademark infringement under 15 U.S.C. § 1114, false designation of origin and passing off under 15 U.S.C. § 1125(a), contributory trademark infringement, and common law fraud arising from certain John Does' use of W.W. Williams Company's ("Plaintiff") trademarks ("Marks") to fraudulently obtain merchandise and Google, Inc's ("Google") refusal to disable the associated Gmail email accounts used to perpetrate the fraud. Plaintiff seeks a temporary restraining order ("TRO") against Google and the John Does. ECF No. 3.[1] For the reasons discussed below, the Court **GRANTS** Plaintiff's motion.

## I. FACTS

Plaintiff previously filed a substantially similar complaint against the same Defendants and sought emergency injunctive relief. The previous case, Case No. 2:13–cv–298, was resolved by agreement of the parties, and an agreed order was entered. The following facts are taken from Plaintiff's second amended complaint

---

[1] Unless otherwise noted, cites are to Case No. 2:13–cv–298.

and/or amended motion for a TRO in the previous case, Case No. 2:13–cv–298, and the verified complaint in the case sub judice.

Plaintiff was established in 1913 and is headquartered in Columbus, Ohio. Plaintiff provides services to trucking companies, the U.S. military, hospitals, data centers, and state and local governments. Plaintiff services trucks that break down and sells and services diesel engines, transmissions, refrigeration units, and power-generation equipment.

John Does are as of yet unknown parties who have attempted to defraud Plaintiff. Plaintiff alleges that these John Does are the same John Does named as Defendants in the prior action. Google is a Delaware corporation with its principal place of business in California, which, in addition to maintaining a search engine, provides a service known as Google Apps Service.

Plaintiff owns four federally registered trademarks: W.W. WILLIAMS, registration number 2816546, registered February 24, 2002; W.W. WILLIAMS (stylized), registration number 2794417, registered December 16, 2003; and two symbols, one with registration number 1,166,781, registered August 25, 1981, and another with registration number 2,773,047, registered October 14, 2003 (collectively, the "Marks"). Compl. 4–5, ECF No.1. In addition, Plaintiff has owned the domain name wwwilliams.com since May 29, 1997.

## A. Facts Related to Case No. 2:13–cv–298

On about March 5, 2013, John Does registered the domain name www.wwwilliamsinc.com through Google Apps.  Through Google's partnership with GoDaddy.com, GoDaddy.com became the registrar of the domain name. After registering the domain name and establishing email accounts, the John Does, posing as Plaintiff, established customer accounts and credit terms with suppliers to induce the suppliers to send them merchandise and bill Plaintiff.

Specifically, on March 13, 2013, someone with the signature block "Carter Monte, Purchasing Manager, W.W. Williams" sent a request for prices for Multigas detectors to Stauffer Glove, using a contact email address of cmonte@wwwilliamsinc.com.  Compl. Ex. E, ECF No. 1-2, Docket No. 2:13–cv–298.  Plaintiff does not employ anyone by that name.

On March 20, 2013, a person identifying herself as "Maude Bechard, Account Payable, W.W. Williams" submitted a credit application form and company credit profile to Idville seeking a $54,000 line of credit under the name Maude Bechard or Jesus Bones.  The email address was ap@wwwilliamsinc.com.  The application contained Plaintiff's actual financial account information and credit references, and the copy of the company credit profile was a copy of actual credit information on Plaintiff's letterhead, displayed Plaintiff's logo, and listed Plaintiff's actual address.  Compl. Ex. F, ECF No. 1-2, Docket No. 2:13–cv–298.  Plaintiff does not employ anyone named Jesus Bones or Maude Bechard.

On March 14, 2013, a person calling himself "Jesus Bones, Purchasing Manager, W.W. Williams" emailed a purchase order to SpringTree Media Group for 106 Shure audio products totaling $21,094.00. The purchase order was on Plaintiff's actual order form, displayed Plaintiff's name and logo, and listed Plaintiff's actual address. The "authorized signature" read "Maude Bechard, Accounts Payable," and the contact information was ap@wwwilliamsinc.com. The shipping address was: Raul Mendez, 204 Montana Azul., Anthony, New Mexico 88021 Tel: (866) 545-0851. Compl. Exh. G, ECF No. 1-3, Docket No. 2:13–cv–298. Plaintiff does not operate a facility at that address and does not employ anyone named Raul Mendez.

On March 25, 2013, a person identifying himself as Carter Monte emailed a purchase order to 24 Hr. Safety seeking various pieces of equipment totaling $42,454.76. The order was on Plaintiff's form, displayed Plaintiff's name and logo, and listed Plaintiff's address. The "authorized signature" again was Maude Bechard, and the contact information was listed as ap@wwwilliamsinc.com. The shipping address was: Malissa Preston, W.W. Williams, 3149 Clarabelle Street, Columbus, GA 31903 Tel: (866) 545-0851. Compl. Exh. H, ECF No. 1-3, Docket No. 2:13–cv–298. Plaintiff does not operate a facility at that address and does not employ anyone named Malissa Preston.

On April 1, 2013, a person identifying himself as "Mark Csikos" sent an email from the address mcsikoswwwilliamsinc.com@gmail.com to

websales@jendcosafety.com seeking price quotes on MSA Altair Multigas
Detectors.  Second Amend. Compl. Ex. I, ECF No. 24-2, Docket No. 2:13–cv–298.

The next day, a person identifying herself as "Davila Javier, Purchasing
Manager, W.W. Williams," sent an email to Brance-Krachy Co., Inc. seeking a
price quote for FLUKE Multimeter products.  *Id.* Ex. J, ECF No. 24-3.

On April 17, 2013, Plaintiff received an invoice from Quest Environmental
& Safety Products, Inc. for $39,129.06 worth of MDA Altair Multigas Detectors
that it did not order or receive.  The invoice stated the products were shipped to
"Raul Mendez, W.W. Williams, 4905 SW 152nd Ave., Beaverton, OR 97007."
Gibson Aff., Second Amend. Compl. Ex. K, ECF No. 24-4, Docket No. 2:13–cv–
298.

On April 22, 2013, someone at Consignia.ca, an online store which sells
digital video projectors, forwarded Plaintiff's counsel a fraudulent email from
"Jesus Bones, Purchasing Manager, W.W. Williams," using the email address
JBones@wwwilliamsinc.com, seeking a price quote for a digital video projector.
*Id.* Ex. L, ECF No. 24-5.

Based on the previous facts, Plaintiff initiated the previous suit against
Domains by Proxy and the John Does.  Compl., ECF No. 1, Docket No. 2:13–cv–
298.  Plaintiff amended the complaint to add Google, TCAST, and Jeffrey Keil,
who turned out to be a victim of identity theft and whose name and credit card
information were used to register the web address through GoDaddy.com.
Amend. Compl., ECF No. 9.  Although Plaintiff sued Domains by Proxy thinking it

had control over the domain name, it was actually GoDaddy.com which had the power to, and did, suspend the domain name www.wwwilliamsinc.com. It transferred that domain name to Plaintiff pursuant to the Court's April 19, 2013, Order. Plaintiff thereafter dismissed Domains by Proxy from the suit.

Plaintiff's second amended complaint was against only Google and the John Does. Second Amend. Compl., ECF No. 24, Docket No. 2:13–cv–298. Plaintiff brought a claim against the John Does for direct trademark infringement under 15 U.S.C. § 1114, a claim against the John Does for false designation of origin and passing off under 15 U.S.C. § 1125(a), a claim against the John Does for common law fraud, and a claim against Google for contributory trademark infringement.

Plaintiff sought a TRO against the John Does and Google requiring: (1) Google to immediately and permanently disable all email accounts hosted on its servers that include the characters wwwilliamsinc and the Gmail accounts djavier.wwwilliamsinc.com@gmail.com and mcsikoswwwilliamsinc.com@gmail.com and an order prohibiting Google from permitting anyone to use a Gmail address including the characters wwwilliamsinc or wwwilliamsinc.com@gmail.com in the future; (2) enjoining the Defendants from infringing or falsely designating the origin of Plaintiff's Marks, using the Marks in commerce, using Plaintiff's credit information, and injuring Plaintiff's reputation; (3) enjoining the Defendants from registering, selling, transferring or assigning any domain name containing the Marks; and (4) enjoining the John

Does from using any of Plaintiff's Marks, or names or marks deceptively similar to Plaintiff's Marks, in connection with a website or as metatags, directory names, other computer addresses, invisible data, or otherwise engaging in acts or conduct that would cause confusion as to the source, sponsorship or affiliation of Plaintiff with the defendants. Plaintiff and Google eventually proposed an agreed order resolving Plaintiff's amended complaint.

## B. Facts Related to Current Case

On May 12, 2013, the domain name wwwilliamsincs.com was registered by John Does through Vistaprint Technologies, Ltd., a hosting service that allows its customers to set up online businesses anonymously and hosts their domains. At about the same time, John Does set up the Gmail email account edouglas.wwwilliamsincs.com@gmail.com through the Google Apps Service. John Does have used the wwwilliamsincs.com address and corresponding gmail account to seek price quotes and place orders for products, including sophisticated satellite cell phones and surveillance equipment, under the name W.W. Williams.

Specifically, on June 11, 2013, a person identifying himself as "Eaton Douglas, Purchasing Manager, W.W. Williams" sent out an email blast from edouglas.wwwilliamsincs.com@gmail.com, with the subject line "Thuraya Order" to several companies, requesting prices on Thuraya SG-2520 satellite mobile phones. Gibson Aff., Ex. A, ECF No. 4-1, Docket No. 2:13–cv–713. Recipients of the emails contacted W.W. Williams to verify Eaton Douglas was an employee

and out found out he was not. One recipient notified W.W. Williams that Thuraya phones are for use only in the Middle East; Africa; and Central, East and Southeast Asia. *Id.*

On June 12, 2013, a John Doe purporting to be "Eaton Douglas" sent more emails requesting pricing on Thuraya satellite phones using the email address edouglas@wwwilliamsincs.com. Gibson Aff., Ex. C, ECF No. 4-1, Docket No. 2:13–cv–713. On June 13, 2013, a John Doe purporting to be "Eaton Douglas" submitted a purchase order via email to Ariana Commerce Corporation of Los Angeles, California for the purchase of thirty-six Thuraya satellite phones totaling $34,850.00. The purchase order was on a W.W. Williams form, which displayed the actual W.W. Williams name and logo and listed W.W. Williams' address on West Goodale Boulevard in Columbus, Ohio. The contact email listed was ap@wwwilliamsincs.com. The "ship to" address was to Jennifer Church in Maine. Gibson Aff., Ex. F, ECF No. 4-2, Docket No. 2:13–cv–713. W.W. Williams has no facilities at the Maine address, nor does it have an employee named Jennifer Church.

On June 14, 2013, W.W. Williams contacted Vistaprint to inform it of the fraudulent use of the domain name wwwilliamsincs.com and the email addresses. Vistaprint terminated the customer account and allowed W.W. Williams to initiate a transfer of the domain the same day. The email account edouglas@wwwilliamsincs.com has been disabled.

On June 18, 2013, the John Does obtained the domain wwwilliamsincss.com through Vistaprint. On July 2, 2013, a John Doe purporting to be "Eaton Douglas" sent an email using the email address edouglas@wwwilliamsincss.com to ask for price quotes on various surveillance and security equipment. Gibson Aff., Ex. G, ECF No. 4-2, Docket No. 2:13–cv–713. W.W. Williams contacted Vistaprint and the wwwilliamsincss.com account was disabled later that day.

However, Google refuses to disable the fraudulent gmail addresses, including edouglas.wwwilliamsincs.com@gmail.com, directing Plaintiff instead to make use of Google's spam procedures. This Opinion and Order addresses the relief sought in Plaintiff's newly filed case and motion for TRO in docket no. 2:13–cv–713.

## II. STANDARD OF REVIEW

The Court considers four factors in determining whether to issue a TRO: (1) whether the movant has established a substantial probability of success on the merits; (2) whether the movant would suffer irreparable harm in the absence of an injunction; (3) whether an injunction would substantially harm third parties; and (4) whether an injunction would serve the public interest. *Winnett v. Caterpillar, Inc.,* 609 F.3d 404, 408 (6th Cir. 2010). The factors are not prerequisites; rather, they must be balanced. *Capobianco, D.C. v. Summers,* 377 F.3d 559, 561 (6th Cir. 2004). For instance, "a strong showing of irreparable harm, decidedly outweighing harm to the defendant, may justify an injunction

even where the movant cannot make a strong showing of likelihood of success on the merits, as long as the plaintiff can show serious questions going to the merits of the suit." *Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1427 (S.D. Ohio 1990) (citing *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1270 (6th Cir. 1985) and *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)).

## III. DISCUSSION

### A. Probability of Success on the Merits

With respect to the first prong, the Court will first consider Plaintiff's likelihood of succeeding on the merits on any of its claims against the John Does and will then turn to a discussion of whether Plaintiff is likely to succeed on its contributory trademark infringement claim against Google.

#### 1. John Does

Plaintiff's first claim is for direct trademark infringement under 15 U.S.C. § 1114. Section 1114(1)(a) states, "Any person who shall, without the consent of the registrant—use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided." 15 U.S.C. § 1114(1)(a). To recover under § 1114, a Plaintiff must show: (1) ownership of a valid, protectable trademark; (2) that the John Does

used the mark in commerce and without the registrant's consent; and (3) there is a likelihood of consumer confusion.[2] *HER, Inc. v. RE/MAX First Choice LLC*, 468 F. Supp. 2d 964, 978 (S.D. Ohio 2007).

Plaintiff is likely to show ownership of a valid, protectable trademark as it has presented registrations of its various Marks. Compl. Ex. A–D, ECF Nos. 1-1, 1-2, Docket No. 2:13–cv–298; *see* 15 U.S.C. § 1115(a).

Next, Plaintiff argues there is no dispute the John Does are using Plaintiff's Marks in commerce without Plaintiff's consent. The Court agrees Plaintiff is likely to show the John Does are using Plaintiff's Marks without its consent—Plaintiff has presented numerous purchase orders containing the Marks which it alleges are fraudulent.

However, the Court is not convinced John Does are "using in commerce" the Marks "in connection with the sale, offering for sale, distribution, or advertising of any goods or services," as those terms are used in § 1114(1)(a) and is therefore not convinced trademark infringement is the proper theory of liability.[3]

Most, if not all, of the trademark infringement cases cited by Plaintiff and reviewed by the Court involve a plaintiff and defendant who both sell goods.

---

[2] The likelihood of confusion between the two marks is also the test used to determine whether there has been false designation of origin and passing off under § 1125(a). *Audi AG*, 469 F.3d at 542.

[3] The Act defines "use in commerce" to mean "bona fide use of a mark in the ordinary course of trade . . . ." A mark is deemed to be in use in commerce when it is placed on goods sold and transported in commerce or when it is used or displaced in the sale or advertising of services rendered in commerce. 15 U.S.C. § 1127.

Typically, the plaintiff sues the defendant, arguing the defendant is using a mark so similar to plaintiff's mark that the consuming public will be deceived into believing either that the defendant is selling plaintiff's bona fide goods or that the plaintiff sponsors the defendant's goods.  Here, Plaintiff has not cited any cases in which a court has applied the § 1114(1)(a) analysis in a case of, essentially, corporate identity theft where a defendant is pretending to be the plaintiff and is using the plaintiff's marks to *buy* goods.  This case is very different from the typical trademark infringement cases, even trademark infringement cases involving the internet, and the Court is not convinced that trademark law applies to the alleged wrongs.[4]

Nonetheless, the Court has not found any cases preventing plaintiffs from bringing § 1114 claims in similar circumstances, and Plaintiff has at least presented serious questions as to the merits of its trademark infringement claim. The Court will therefore apply the eight-part likelihood of confusion test as best it can to this scenario.

Whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties, is "[t]he touchstone of liability . . . ." *Interactive Prods. Corp. v. A2Z Mobile Office Solutions, Inc.*, 326 F.3d 687, 694 (6th Cir. 2003).  "[I]n determining

---

[4] Indeed, the Supreme Court has stated the goals of the Trademark Act are to protect the trademark's owner from deprivation of goodwill when an infringer applies the trademark to his own goods and to protect consumers' ability to distinguish between goods of competing manufacturers. *Inwood*, 456 U.S. 844 at 855 n. 14. This case does not implicate either goal.

whether there is a likelihood of confusion, the following eight factors should be considered: (1) strength of plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing of channels used; (6) degree of purchaser care; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion in selecting the mark. *Audi AG v. D'Amato*, 469 F.3d 534, 542–43 (6th Cir. 2006) (citation omitted). However, "[e]ach case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case." *Interactive Prods. Corp.*, 326 F.3d at 694 (internal quotation omitted). Because of the context of the case, the Court will analyze the likelihood of supplier confusion as opposed to consumer confusion.

The first factor is a "factual determination of the mark's distinctiveness. The more distinct a mark, the more likely is the confusion resulting from its infringement . . . ." *Audi AG*, 469 F.3d at 543. There has been no evidence presented regarding how distinctive Plaintiff's Marks are, and this factor is therefore neutral.

With respect to the second factor, the Sixth Circuit has held "if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar." *Id.* While this factor is relevant in typical trademark infringement cases, it is not relevant in this case as the John Does are not offering goods or services that contain Plaintiff's marks.

In considering the third factor, "courts should examine the pronunciation, appearance, and verbal translation of conflicting marks." *Id.* (quotation omitted). "[W]ith respect to domain names, addition of characters along with the mark does not eliminate the likelihood of confusion." *Id.* (quotation omitted).

Here, Plaintiff's domain name is "wwwilliams.com," and the disputed domain names are "wwwilliamsinc.com," "wwwilliamsincs.com," and "wwwilliamsincss.com." The email addresses used to make the fraudulent orders also contain the phrase "wwwilliamsinc.com" or "wwwilliams" The portion which includes Plaintiff's Mark ("wwwilliams") is pronounced the same in both Plaintiff's domain name and the John Does' domain name. Additionally, the domain names appear in the same font and in all lower case letters. The addition of "inc," "incs," or "incss" after "wwwilliams" in the John Does' domain name and email addresses does not distinguish those names from Plaintiff's domain name sufficiently to avoid confusion. *PACCAR Inc. v. Telescan Tech. LLC*, 319 F.3d 243, 252 (6th Cir. 2003) (affirming district court's finding that use of exact character match in domain name creates likelihood of confusion), *overruled in part*, K.P. Permanent Make-Up, 543 U.S. 111, 123 (2004); *Interactive Prods. Corp.*, 326 F.3d at 696 (noting that other courts have determined that "use of another's trademark in one's website domain name violates trademark law . . . .").

Additionally, on the fraudulent purchase order forms, the John Does are using Plaintiff's exact trademarked name—"W.W. Williams"—and trademarked

symbol of three intertwining stylized Ws enclosed in a circle.  See Compl. Ex. D–
J, ECF No. 1, Docket No. 2:13–cv–298; see also Gibson Aff., Ex. F, ECF No. 4-
2, Docket No. 2:13–cv–713.  Thus, the third factor suggests that supplier
confusion is likely.

The fourth factor, evidence of actual confusion, is "the best indicator of
likelihood of confusion," *Audi AG*, 469 F.3d at 543, and is also met here.  Plaintiff
has presented the affidavit of its Corporate Secretary stating that Plaintiff
received an invoice from a supplier for a fraudulent purchase.  Gibson Aff.,
Second Amend. Compl., Ex. K, ECF No. 24-4, Docket No. 2:13–cv–298.  Receipt
of an invoice indicates the supplier thought Plaintiff made the order.  Thus, there
is evidence of actual supplier confusion in this case, and that factor arguably
weighs in favor of a likelihood of confusion.

The fifth factor is not relevant to this case as it considers whether the
customers of the parties' goods or services are similar and whether the parties'
marketing approaches are similar.  *Audi AG*, 469 F.3d at 543.

The sixth factor questions whether consumers would be likely to exercise a
high degree of care when purchasing the defendants' goods.  *Id.* at 544.
Although this factor does not apply directly to this case, it can be analogized as a
determination of whether suppliers would exercise a high degree of care when
filling the John Does' purchase orders.  Even though the products the John Does
are ordering are expensive, which would lead one to exercise a high degree of
care, the John Does are using Plaintiff's real business address, business name in

the email signature block, real order forms, real financial account information,
and real credit references.  Even exercising a high degree of care, suppliers are
likely to be confused.

With respect to the seventh factor, "if the mark was adopted with the intent
of deriving benefit from the reputation of [the plaintiff], that fact alone may be
sufficient to justify the inference that there is confusing similarity."  *Id.* (quotation
omitted).  Additionally, "the use of a contested mark with knowledge of the
protected mark at issue can support a finding of intentional copying."  *PACCAR*,
319 F.3d at 254.  Here, there is direct evidence of intentional copying of Plaintiff's
Marks, as the John Does are using Plaintiff's exact Marks coupled with its real
business address, credit references, and financial account information.  John
Does are using the Marks to capitalize on Plaintiff's business reputation and
obtain free merchandise at the expense of Plaintiff's reputation and good will with
its suppliers.  The John Does' use of the Marks is intended to deceive suppliers
into believing the suppliers are dealing with Plaintiff.

The eighth factor, likelihood of expansion of product lines, is inapplicable.

After analyzing these factors, the Court finds that not only is there a
likelihood of confusion, but there is actual confusion.  The John Does are using
Plaintiff's actual Marks in the signature lines of the fraudulent emails and in the
John Does' email addresses, leading would-be suppliers to believe the emails
are coming from Plaintiff or Plaintiff's employees.  The John Does are further
representing themselves as Plaintiff's employees by using Plaintiff's actual

business name and business address in the signature blocks of the emails. The John Does also used Plaintiff's Marks, in conjunction with Plaintiff's actual address, trade references, and financial account information, in the credit application to Idville as well as in the fraudulent purchase orders to SpringTree Media Group and 24 Hr. Safety. Compl. Exs. E–J, ECF Nos. 1-2, 1-3, Docket No. 2:13–cv–298; *see also* Gibson Aff., Ex. F, ECF No. 4-2, Docket No. 2:13–cv–713 (without financial account information). There is no doubt that the John Does are purposefully intending to deceive the supplying companies into believing that the purchase orders are coming from or are made with Plaintiff's consent.

Accordingly, to the extent a trademark infringement claim applies to this circumstance, Plaintiff is likely to succeed on the claim. As Plaintiff is likely to succeed on that claim, the Court does not discuss the merits of Plaintiff's fraud claim.

## 2. Google

Plaintiff also brings a claim against Google for contributory trademark infringement. In a more traditional trademark infringement case (a case involving two sellers of goods), the Supreme Court has stated, "liability for trademark infringement can extend beyond those who actually mislabel goods with the mark of another." *Inwood Labs., Inc. v. Ives Labs, Inc.*, 456 U.S. 844, 853 (1982). "[I]f a manufacturer or distributer intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has

reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorially responsible for any harm done as a result of the deceit." *Id.* at 854 (internal citations omitted). Plaintiff argues that under this test, Google is contributorially liable for the John Does' trademark infringement.

Just as Plaintiff has raised serious questions as to the whether John Does are liable for direct trademark infringement, it has also raised serious questions as to whether Google can be contributorially liable for such infringement. While *Inwood's* test does not neatly apply to Google in this case (as it is neither a manufacturer or distributor and arguably does not supply a product), courts have applied *Inwood's* test outside of the context of manufacturers and distributors and even when the party supplies a service rather than a product. *See e.g. Hard Rock Café Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1148–49 (7th Cir. 1992).

The Sixth Circuit, at least two other circuits, and this Court have applied the contributory infringement doctrine to defendants who were not distributors or manufacturers when the defendant supplied a product or service to the infringer. *Coach, Inc. v. Goodfellow*, 717 F.3d 498 (6th Cir. 2013) (flea market operator contributorially liable for trademark infringement where he continued to supply product or service to vendors he knew or had reason to know were engaging in trademark infringement); *Hard Rock Café*, 955 F.2d at 1148–49 (treating contributory infringement as a species of tort and finding owner of flea market could be contributorially liable for infringements by its vendors); *Fonovisa, Inc. v.*

*Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996) (adopting the Seventh Circuit's standard); *Habeeba's*, 430 F. Supp. 2d at 714.

When applying *Inwood* to parties who provide a service rather than a product, the Ninth Circuit has considered the extent and control a defendant exercises over a third party's means of infringement. *Lockheed*, 194 F.3d at 984. If a defendant exercises direct control and monitors the instrumentality used for infringement, a court can apply *Inwood* to defendants who merely supply services rather than products. *Id.* Thus, when dealing squarely with services, the Ninth Circuit applies a modified *Inwood* standard, requiring a plaintiff to establish that the defendant "continued to supply its services to one who it knew or had reason to know was engaging in trademark infringement" *and* show that the defendant has "direct control and monitoring of the instrumentality used by a third party to infringe." *Louis Vuitton Malletier v. Akanoc Solutions, Inc.*, 658 F.3d 936, 942 (9th Cir. 2011) (quoting *Lockheed*, 194 F.3d at 984).

As presented, the Court is unable to determine whether Plaintiff is likely to succeed on the merits of its claim against Google. Plaintiff has argued that Google became aware of the alleged fraud and is still permitting the John Does to utilize its services/products (the email addresses hosted on Google's servers). Plaintiff argues the John Does would be unable to accomplish their scheme without the email accounts.

But, that may not be enough. The parties have not briefed whether the email accounts, which are hosted on Google's servers, should be construed as

"products" or "services," and as such, the Court is unable to determine whether the traditional *Inwood* test should be applied, whether the Ninth Circuit's "service" test should be applied, or whether some other test should be applied. At least one case suggests Plaintiff's theory would fall under the "services" test. *Symantec Corp. v. Logical Plus, Inc.*, No. C 06–7963 SI, 2009 WL 3416178, at *8 (N.D. Cal. Oct. 20, 2009) (finding that provider of email address which defendant used to sell counterfeit merchandise was supplying service for purposes of contributory infringement analysis but finding there was no evidence provider exercised direct control and monitoring of the email addresses).

As noted, under the Ninth Circuit's "services test," Google would be liable only if Plaintiff can make the additional showing that Google retains direct control and monitoring of the email accounts John Does are using to perpetrate fraud. Plaintiff has not presented *evidence* of Google's ability to monitor or control the disputed email accounts, but the Court has no reason to doubt counsel's unsupported argument that Google controls the file servers, Gmail accounts, and email systems John Does are utilizing.

Accordingly, while the Court cannot find that Plaintiff is likely to succeed on the merits of its claim against Google, it has at least presented serious questions going to the merits of that claim. *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 106–07 (2nd Cir. 2010) (holding, without adopting the Ninth Circuit's "control" test, an internet service provider may be contributorially liable for trademark infringement if it "continues to supply its service to one whom it knows or has reason to know

is engaging in trademark infringement,"); *Cf., e.g.*, *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 164 (4th Cir. 2012) (reversing grant of summary judgment because trier of fact could find Google continued to allow identified infringers to use its AdWords services). In any subsequent briefing before the preliminary injunction hearing, however, all parties should specifically discuss what test it believes applies to each claim at issue and lay out the prima facie elements of a claim under that test.

## B. Irreparable Harm

Plaintiff argues the Court should find a presumption of irreparable injury because it has demonstrated a likelihood of confusion. There is some discussion among courts as to whether the presumption of harm in trademark cases is appropriate given the United States Supreme Court's decision in *eBay, Inc. v. MercExchange*, 547 U.S. 388 (2006). *CLT Logistics v. River West Brands*, 777 F. Supp. 2d 1052, 1072 (E.D. Mich. 2011). The Sixth Circuit has not addressed whether *eBay* applies to injunctions in trademark cases. *Id.*

Even without applying a presumption for irreparable injury, though, the Court finds this factor strongly weighs in favor of granting the TRO as Plaintiff is likely to continue to suffer irreparable harm without the requested relief.

According to the Court's July 19, 2013 hearing, John Does were placing fraudulent purchase orders as late as that afternoon. There is no indication John Does have ceased attempting to make fraudulent purchase orders in Plaintiff's name. As long as John Does have the ability to send fraudulent emails, there is

potential for future harm, and there is therefore no adequate remedy at law.  *Cf.*
*Audi AG*, 469 F.3d at 550.  It appears the way to stop the fraud is to disable the
email accounts that the John Does are using to perpetrate the fraud.

Furthermore, John Does' unauthorized use of Plaintiff's Marks could
irreparably harm Plaintiff's good name and reputation if Plaintiff fails to pay
suppliers for the fraudulently ordered supplies.  It could make suppliers hesitant
to work with Plaintiff in the future.  Additionally, the intended use of the
purchased products is unknown, but counsel has represented that many of the
products ordered are banned outside of the United States and that the John
Does are seeking satellite phones usable only in the Middle East, Africa, and
Central, East and Southeast Asia, as well as surveillance equipment.  Therefore,
Plaintiff's reputation could be harmed if its name becomes linked to a nefarious
use of the ordered products.  For all these reasons, the irreparable harm factor
weighs strongly in favor of granting a TRO.

## C. Harm to Third Parties

The only entities who may be harmed by the TRO are the John Doe
defendants.  John Does are the alleged infringers who are attempting to defraud
various supplying companies, and the Court does not consider the harm to John
Does.  *See Audi AG*, 469 F.3d at 550 ("[defendant] faces no hardship in
refraining from willful trademark infringement . . . ."); *Worthington Foods*, 732 F.
Supp. at 1461 ("harm caused to apparent infringers, however, is not entitled to
consideration in assessing the harm caused by an injunction.").

In fact, the third party potential suppliers whom the John Does are targeting would be helped by a TRO, as the TRO could assist in preventing the John Does from making additional fraudulent purchase requests. Thus, this factor weighs in favor of granting the TRO.

## D. Public Interest

As a TRO could help avoid the ongoing confusion and fraud in the marketplace, the public interest favors a TRO in this case. *Cf. Audi AG*, 469 F.3d at 550; *Worthington Foods*, 732 F. Supp. at 1463. Moreover, the public has an interest in preventing the illegal purchase of prohibited items.

## E. Bond

Federal Rule of Civil Procedure 65 states "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Despite the mandatory language of the rule, the Court has discretion to determine an appropriate amount of, or even waive, bond. *USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 100 (6th Cir. 1982).

The purpose of bond is to protect the party injured from damage occasioned by the injunction. *Id.* Neither the John Does nor Google will be injured by this TRO, and the Court therefore requires a nominal bond in the amount of $10.

## F. Scope of Injunction

Pursuant to Federal Rule of Civil Procedure 65(d)(2), Google, its officers, agents, servants, employees, and attorneys, and any other persons in active concert or participation with Google and the John Does, their agents, servant, employees, assigns, representatives and successors and all people in active concert with them, are **ORDERED**

- To immediately and permanently disable all email accounts hosted on Google's servers that include the characters "wwwilliam" or "wwwilliamsincs" or "wwwilliamsincss," in that order, including but not limited to the Gmail accounts edouglas.wwwilliamsincs.com@gmail.com and edouglas.wwwilliamsincss.com@gmail.com, and not in the future permit anyone to utilize a gmail system email address that includes the characters "wwwilliam" in that order,
- To stop infringing or falsely designating the origin of the W.W. Williams Marks, as defined in the Verified Complaint, from using the W.W. Williams Marks in commerce in any way, from using W.W. Williams credit information in any way, and from injuring W.W. Williams' reputation,
- Stop using any of the W.W. Williams Marks or names or marks deceptively similar to the W.W. Williams Marks in connection with a website or as metatags, directory names, other computer addresses, invisible data, or otherwise engaging in acts or conduct that would cause confusion as to the source, sponsorship or affiliation of W.W. Williams with Defendants.

Pursuant to Rule 65(d)(2), the Order is binding only on those who receive actual notice of it by personal service or otherwise.  Fed. R. Civ. P. 65(d)(2).

This Order is issued on this day July 22, 2013 at 4:45 p.m.  It was entered without notice to the John Doe defendants because they have not been identified.  It memorializes an oral order granted July 19, 2013 at approximately 3:45 p.m. without notice to Google because the facts in Janet Gibson's affidavit

and Plaintiff's verified complaint show Plaintiff is likely to suffer immediate and irreparable injury before Google can be heard in opposition.  The Order will expire **FOURTEEN DAYS** from the date of entry unless Google consents to a longer extension or the Court extends it for a like period of time for good cause. Fed. R. Civ. P. 65(b)(2).  The parties should contact the Court with proposed times for a preliminary injunction hearing.

## IV.   CONCLUSION

Although Plaintiff has not necessarily shown a strong likelihood of success on the merits, as the Court is not yet convinced this case is properly brought as a trademark infringement case under § 1114(1)(a), Plaintiff has raised serious questions as to whether § 1114(1)(a) is applicable.  If applicable, Plaintiff has moreover raised serious questions as to Google's liability for contributory trademark infringement.  Additionally, Plaintiff has shown irreparable harm, that a TRO would not harm John Does or Google, and that a TRO would be in the public interest.  Accordingly, the Court **GRANTS** the TRO as stated above.

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**